FILE COPY

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JUDGE CARTER

15 CV Case No. 2666

---

J.C. on behalf of M.J.,

        Plaintiff,

        v.

New York City Department of Education and
CARMEN FARIÑA, in her official capacity as
Chancellor of the New York City School District,

        Defendants.

                            X

**COMPLAINT**



RECEIVED
APR 0 6 2015
U.S.D.C. S.D. N.Y.

## PRELIMINARY STATEMENT

1)    This action is brought by J.C., the Mother of M.J. (the "Mother"), who is currently a fifteen-year-old New York City resident. She is currently classified with Intellectual Disability by Defendant New York City Department of Education ("DOE"). At the time of the events set forth herein, the DOE had classified M.J. with Autism.

2)    The Mother brings this action because the DOE failed to provide M.J. a free appropriate public education for the 2013-2014 school year, which it was required to do under the Individuals With Disabilities Education Improvement Act, 20 U.S.C. § 1400 et seq.

3)    The DOE is required to provide a free appropriate public education to all children with disabilities who reside in New York City. 20 U.S.C. § 1400, et seq.; N.Y. Educ. Law §§ 4401, 4402, 4404, 4410; 8 N.Y.C.R.R. § 200. A free appropriate public education is an education provided at public expense that provides significant learning and confers a meaningful benefit gauged in relation to the student's potential. *See* 20 U.S.C. § 1401(9); *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 130 (2d Cir. 1998); *see Polk v. Central Susquehanna*

*Intermediate Unit 16*, 853 F.2d 171 (3d Cir. 1988) (the IDEA "calls for more than a trivial educational benefit" and requires a satisfactory Individualized Education Program to provide "significant learning" and confer "meaningful benefit" and that benefit "must be gauged in relation to the child's potential.")   When the DOE fails in its obligations to provide a free appropriate public education, parents may enroll a child in a private school and seek tuition payment from the school district. *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 363 (2d Cir. 2006).

4)       To determine whether the school district is obligated to pay a student's tuition for an appropriate education at a private school, the Supreme Court established a three-pronged test: (1) were the student's educational program and/or placement inappropriate; (2) was the private school in which the parent unilaterally placed the student appropriate for the student's needs; and, (3) do the equitable considerations favor granting the relief. *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 370-74 (1985).   If the answer to all three questions is yes, the school district must pay the student's private school tuition.

5)       Defendants failed to provide M.J. with her federally- and state-mandated free appropriate public education for the 2013-2014 school year in that: (1) the DOE's recommendation that M.J. attend a District 75 school with a staffing ratio of 6 students, 1 teacher and 1 paraprofessional ("District 75 6:1:1") was not an appropriate program in the least restrictive environment; (2) M.J. did not meet the criteria for a classification of Autism resulting in an inappropriate IEP; (3) the DOE failed to timely offer the Mother a public school placement for M.J. prior to the commencement of the 2013-2014 school year; and (4) the public school eventually recommended by the DOE was not appropriate and could not implement M.J.'s IEP.

6)       Even the DOE has recognized that the District 75 6:1:1 program and Autism classification were not appropriate.   At an IEP meeting for M.J. in 2014, the DOE's Committee

2

on Special Education told the Mother that the District 75 6:1:1 program recommended to M.J. in 2013 was not appropriate for her and was too restrictive.  The DOE's Committee on Special Education also told the Mother that M.J. should not be classified with Autism.  Accordingly, in 2014 the DOE's Committee on Special Education recommended that M.J. be classified with Intellectual Disability and recommended that M.J attend a District 75 school with a staffing ratio of 12 students, 1 teacher and 1 paraprofessional ("District 75 12:1:1").

7)      To remedy the deprivation of M.J.'s right to a free appropriate public education, the Mother placed M.J. in the Cooke Center School ("Cooke"), a non-public school in New York, New York that specializes in teaching students like M.J. with cognitive impairments and learning disabilities.

8)      The Mother filed a due process complaint seeking direct tuition payment for Cooke for the 2013-2014 school year from the DOE and requesting an impartial hearing.

9)      Following a three-day impartial hearing, the Impartial Hearing Officer ("Hearing Officer") issued a Findings of Fact and Final Decision (the "IHO Decision"), dated January 8, 2014. (Attached hereto as Exhibit A is a copy of the IHO Decision dated January 8, 2014.)[1]  The Hearing Officer correctly found that the DOE had failed to offer M.J. a free appropriate public education because the District 75 6:1:1 program was not the least restrictive environment. (*Id.* at 10.)

10)      The Hearing Officer disagreed with the Mother's other arguments as to why the DOE had failed to offer M.J. a free appropriate public education, finding that: (a) the DOE failed to provide the Mother with a timely notice of a public school placement for M.J., but the failure to do so did not rise to the level of a deprivation of free appropriate public education; (b) the

---

[1]  Pursuant to section 1417(c) of the Individuals with Disabilities Education Act and section 1232g of the Family Educational and Privacy Rights Act, Exhibit A has been redacted as to the names of M.J. and J.C. to protect their privacy. *See* 20 U.S.C. § 1417(c) 20 U.S.C. § 1232g.

DOE properly classified M.J. with Autism; and (c) the District 75 6:1:1 program could have been reasonably calculated to afford educational benefit to M.J. (*Id.* at 4-8.)

11)     The Hearing Officer correctly found that Cooke was appropriate to meet M.J.'s needs and that the equities favored granting the Mother direct tuition payment because "district acted in dubious faith while the parent acted in exemplary good faith." (*Id.* at 11, 12.).

12)     The DOE appealed to the New York State Review Officer ("State Review Officer") from the portion of the IHO Decision that found that: the DOE did not offer a free appropriate public education in the least restrictive environment; the Mother was not timely provided with a FNR; Cooke was appropriate; and the equities favored ordering tuition payment. The Mother cross-appealed from the parts of the IHO Decision that found that: the DOE's failure to timely provide the Mother with notice of a public school placement did not constitute a deprivation of free appropriate public education; the DOE properly classified M.J. with Autism; and the 6:1:1 program was reasonably calculated to afford M.J. an educational benefit.  In a decision dated December 12, 2014, eight months after the State Review Office was supposed to issue a decision, (the "SRO Decision"), the State Review found that the DOE had offered M.J. a free appropriate public education and reversed the portions of the IHO Decision that found that the DOE had not offered M.J. and free appropriate public education and that ordered the DOE to pay for M.J.'s tuition at Cooke for the 2013-2014 school year. (Attached hereto as Exhibit B is a copy of the Decision of the SRO issued December 12, 2014; *see* p. 12.)

13)     Having made that decision, the State Review Officer concluded that it need not consider whether Cooke was appropriate or whether the equities favored awarding the Mother direct tuition payment to Cooke for M.J.'s tuition for the 2012-2013 school year. (*Id.*)

14)     M.J.'s Mother brings this action to require Defendants to pay the costs for M.J.'s tuition at Cooke for the 2012-2013 school year as a result of the DOE's failure to provide M.J.

with a free appropriate public education in the least restrictive environment for the 2011-2012 school year.

## JURISDICTION

15)     This Court has jurisdiction under 28 U.S.C. § 1331, in that claims are asserted under the laws of the United States; under 28 U.S.C. § 1343(a), in that claims are asserted under laws providing for the protection of civil rights; and under 20 U.S.C. § 1415(i)(2) & (3) and 29 U.S.C. § 794(a).   This Court has supplemental jurisdiction over all state law claims herein asserted pursuant to 28 U.S.C. § 1367, as such state law claims form part of the same case or controversy as the claims for which this Court has original jurisdiction.

16)     The venue is proper under 28 U.S.C. § 1391(b).

17)     If successful, Plaintiffs are entitled to costs and attorneys' fees under 20 U.S.C. § 1415(i)(3) and 29 U.S.C. § 794a(a)(2).

## PARTIES

18)     Plaintiff J.C. is the mother of plaintiff M.J., a child with a disability.   M.J. lives with her Mother, stepfather, and younger sister in the Bronx, New York.   M.J. is a fifteen-year-old New York City student.   During the 2013-2014 school year at issue in this complaint, M.J. was thirteen years old and the DOE had classified her with Autism.   The Mother has sole custody of M.J. and is unemployed.

19)     Upon information and belief, Defendant New York City Department of Education ("DOE") is the official body charged with the responsibility of developing policies with respect to the administration and operation of the public schools in the City of New York, including programs and services for students with disabilities.   N.Y. Educ. Law §§ 2590, 2590-g (McKinney 2009.)   The DOE is a recipient of federal assistance.   The DOE is a branch of

municipal government in New York City, with its principal place of business located at 52 Chambers Street, New York, New York, 10007.

20)     Upon information and belief, Defendant Carmen Fariña is the Chancellor of the New York City Department of Education ("the Chancellor"), and as such is entrusted with the specific powers and duties set forth in N.Y. Educ. Law § 2590-h (McKinney 2010), including oversight of the DOE's provision of education and services to students with disabilities under the IDEA, Section 504, and New York Education Law.  The Chancellor's principal place of business is located at 52 Chambers Street, New York, New York, 10007.  Collectively, the Chancellor and the DOE are referred to herein as "Defendants."

## OVERVIEW OF APPLICABLE FEDERAL LAW

21)     Congress enacted the Individuals with Disabilities Education Improvement Act ("IDEA") to ensure that students with disabilities are provided with meaningful access to public education.  States who participate in the IDEA receive substantial federal funds in exchange for their agreement to provide a free appropriate public education to all disabled children in the state, and to comply with the IDEA's procedural and substantive mandates.

22)     New York has chosen to participate in the IDEA framework, and has established procedures for providing special educational services to children with disabilities.  N.Y. Educ. Law § 4401 et seq.

23)     The primary mechanism for insuring implementation of the IDEA's mandate of a free appropriate public education is the Individualized Education Program ("IEP").  An IEP is a document written by a multi-disciplinary team, prepared for every child with a disability, which describes a child's present levels of performance and provides a roadmap for that child's educational program for the upcoming school year. The IEP sets forth the special education and related services, supplementary aids and services, health needs and services, and program

modifications or supports for school personnel to be provided to a child in order to enable that

child to achieve a comprehensive and individualized set of annual goals and short-term

objectives.

24)    The IDEA requires that students be educated in the "least restrictive

environment":

> [t]o the maximum extent appropriate, children with disabilities, including children
> in public or private institutions or other care facilities, are educated with children
> who are not disabled, and special classes, separate schooling, or other removal of
> children with disabilities from the regular educational environment occurs only
> when the nature or severity of the disability of a child is such that education in
> regular classes with the use of supplementary aids and services cannot be
> achieved satisfactorily.

20 U.S.C. § 1412(a)(5).

25)    A free appropriate public education is an education provided at public expense

that provides significant learning and confers a meaningful benefit gauged in relation to the

student's potential. *See* 20 U.S.C. § 1401(9); *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d

119, 130 (2d Cir. 1998); *see Polk v. Central Susquehanna Intermediate Unit 16*, 853 F.2d 171

(3d Cir. 1988) (the IDEA "calls for more than a trivial educational benefit" and requires a

satisfactory IEP to provide "significant learning" and confer "meaningful benefit" and that

benefit "must be gauged in relation to the child's potential.")

26)    When a school district fails to provide a free appropriate public education, the

school district may be required to pay for the student's private placement when the private

placement is appropriate to meet the student's needs and the equities favor granting the relief of

payment for the student's private school tuition. *See* 20 U.S.C. § 1412(a)(10)(C)(ii); 20 U.S.C. §

1415(i)(2)(C)(iii).

27)    Section 504 of the Rehabilitation provides that "[n]o otherwise qualified

individual with a disability in the United States . . . shall, solely by reason of his or her disability,

be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." 29 U.S.C. § 794(a). Section 504 requires school districts to provide a free appropriate public education to each student with a disability. 34 CFR § 104.33. The DOE receives federal funding and is subject to the requirements of Section 504.

28)     M.J. qualifies as a person with a disability under Section 504.

### FACTUAL ALLEGATIONS

**M.J.'s Educational Background**

29)     M.J. has always had speech and language difficulties. When M.J. was two years old, she was not yet speaking. Her pediatrician referred M.J. to early intervention, at which time a psychologist diagnosed her with Pervasive Developmental Disorder. M.J. received early intervention services until she was three-and-a-half years old.

30)     M.J. attended kindergarten and first grade at PS 191 in Manhattan. M.J. first had an IEP when she was in first grade. At that time, the DOE classified her with Speech Impairment. M.J. attended PS/MS 280 in the Bronx in second grade after her family moved, and was placed in a DOE community school with a 12:1:1 staffing ratio. The DOE continued to classify M.J. with Speech Impairment through fifth grade, and she remained at the same school.

31)     During M.J.'s sixth-grade year at PS/MS 280, M.J.'s teachers informed the Mother that M.J. was not making academic progress and that, in their opinions, the school was not right for M.J. Around that time, M.J. was referred to the Children's Evaluation and Rehabilitation Center at Albert Einstein College of Medicine, Yeshiva University ("Einstein"), "due to lack of progress despite years of special education services."

32)     At Einstein, clinicians performed the following evaluations on M.J.: pediatric neurodevelopmental; speech/language; and psychoeducational. The clinicians who performed

the evaluations met as a team and agreed upon diagnoses and recommendations for M.J. Dr. Justin Miller, who performed the psychoeducational evaluation, reviewed each professional's report, extracted information from each report, and summarized the reports, diagnoses, and recommendations in a "Team Conference Summary" dated July 27, 2011 ("Einstein Evaluation").

33)   The Einstein Evaluation reflected that the clinicians diagnosed M.J. with Pervasive Developmental Disorder, phonological disorder, and borderline intellectual functioning, but also noted that M.J. had few symptoms of Autism Spectrum Disorder.

34)   The clinicians recommended that M.J. continue her public school placement at the time—a classroom with a 12:1:1 staffing ratio in a community school with speech/language and counseling services—but that she should be considered for a non-public school placement if she did not make progress.

35)   The clinicians did not recommend a District 75 6:1:1 because, as one of the clinicians testified at the impartial hearing, District 75 schools are for children with greater impairment with an autism spectrum disorder, a more severe intellectual disability, or emotional and behavioral disturbance that is unmanageable anywhere else. The clinician testified that a District 75 6:1:1 was "too restrictive".

36)   Prior to M.J.'s IEP meeting in the fall of 2011 for the 2011-2012 school year, M.J.'s speech teacher was told by a school psychologist that the DOE was going to recommend a District 75 school at M.J.'s next IEP meeting. M.J.'s speech teacher told the Mother that a District 75 school was not appropriate for M.J.

37)   At the IEP meeting in 2011, the DOE changed M.J.'s classification from Speech Impairment to Autism, telling the Mother that it had to change her classification to Autism in

9

order to recommend a District 75 school. The IEP in 2011 mandated that M.J. attend a District 75 6:1:1 class.

38)   A 6:1:1 class is a class with six students, one teacher, and one paraprofessional. District 75 is the DOE school district solely for students with the most severe disabilities who are unable to receive an appropriate education in any of the geographic DOE school districts that teach students in general and special education. [CITE TO DOE WEBSITE?]

39)   The DOE failed to offer M.J. a public school placement in a District 75 6:1:1 for the 2011-2012 school year, and M.J. continued attending PS/MS 280.

40)   In April of 2012, a DOE psychologist called the Mother and stated that he was mailing a copy of M.J.'s IEP for the next year to her, but that nothing had changed. When the Mother received the IEP, she noticed that it stated that a meeting had been held on April 25, 2012, and that the DOE had changed the projected implementation date to May 21, 2012. The Mother had never been invited to attend any such IEP meeting in April of 2012. Without the Mother's participation, and apparently without a meeting, the DOE had again misclassified M.J. with Autism and recommended a District 75 6:1:1 for the 2012-2013 school year.

41)   Based upon the concerns raised by M.J.'s teachers at PS/MS 280 both about M.J.'s progress and the DOE's recommendation that M.J. attend a District 75 school, the Mother visited several schools for students on the autism spectrum. She did not find any of them to be appropriate for M.J. because the students seemed lower-functioning and the schools were too restrictive.

42)   The Mother also visited Cooke in November of 2011, saw that the children were similar in manner to M.J.—with similar speech and language impairments—and submitted an application. The program was also departmentalized, meaning that the children moved to different classrooms for different subjects, giving them the opportunity to interact with different

10

teachers and different children.  Cooke eventually accepted M.J.  M.J. attended Cooke's summer

academic session in 2012, as well as its September 2012 to June 2013 school year funded by the

DOE.

**The DOE Convenes An IEP Meeting For the 2013-2014 School Year And**
**Improperly Continues the Classification and Program Recommendation from the 2012 IEP**

43)     The DOE's Committee on Special Education convened an IEP meeting for the

2013-2014 school year on February 12, 2013.

44)     The Committee on Special Education relied, in part, upon the Einstein

Evaluation, incorporating its diagnoses into the IEP.

45)     However, the DOE Committee on Special Education elected to disregard the

remainder of the Einstein Evaluation.  Despite the fact that the Einstein Evaluation found that

M.J. showed few signs of Autism, thus diagnosing her with Pervasive Developmental Disorder-

Not Otherwise Specified, the DOE's Committee on Special Education classified M.J. with

Autism.  Despite the fact that the Einstein Evaluation recommended that M.J. continue her

education in a 12:1:1 staffing ratio in a community school or placed in a non-public school

placement, it recommended that M.J. attend a District 75 6:1:1 with counseling and speech-

language therapy for the 12-month school year (the "2013 IEP").

**The DOE Deprived M.J. of a Free Appropriate Public Education Because The Program**
**That It Recommended Was Not Appropriate And Not The Least Restrictive Environment**

46)     The DOE deprived M.J. of a free appropriate public education.  The DOE failed

to submit evidence at the Impartial Hearing that the District 75 6:1:1 program was an appropriate

program in the least restrictive environment.  Further, the Mother submitted evidence that the

District 75 6:1:1 program was inappropriate for M.J. and was not the least restrictive

environment in which she could be educated.

47)    The only individuals who recommended that M.J. be placed in a District 75 6:1:1 were members of the DOE's Committee on Special Education, Rose Fochetta and Feng Ye, neither of whom had ever personally evaluated, observed, or worked with M.J.

48)    Ms. Ye, who attended the 2013 IEP meeting as the "special education teacher", did not have experience teaching special education in a District 75 6:1:1.

49)    Ms. Fochetta attended the 2013 IEP meeting as a District Representative. The role of a District Representative at an IEP meeting is to be knowledgeable of the programs and resources available to students within the District and to discuss those with the parent.

50)    There were no documents at the 2013 IEP meeting recommending that M.J. be placed in District 75 6:1:1. To the contrary, at the 2013 IEP meeting the DOE's Committee on Special Education possessed the Einstein Evaluation, which recommended that M.J. remain in the 12:1:1 in a community school with support services.

51)    Notably, the DOE's Committee on Special Education did not dispute the Einstein Evaluation. In fact, Ms. Fochetta testified that the Einstein Evaluation was consistent with the information the team learned about M.J. from her then-teacher at the 2013 IEP meeting, and that she and Ms. Ye had relied upon it at the 2013 IEP meeting. But despite this assertion, without explanation, the DOE's Committee on Special Education chose to disregard the Einstein Evaluation's recommendations.

52)    Further, at the time of the 2013 IEP meeting, M.J. was attending Cooke in a classroom with 12 students and was making M.J. progress, demonstrating that she did not need to be in a classroom with only 6 students.

53)    Ms. Fochetta testified at the Impartial Hearing that the DOE's Committee on Special Education ruled out placing M.J. in a 12:1:1 in a community school because those programs only operate for 10 months and M.J. needed instruction throughout the year.

12

54)     The fact that M.J. may have needed instruction throughout the year, and the fact that the DOE's community schools are only in session for 10-months, did not abdicate the DOE of its responsibility to consider other ways to accommodate M.J. in a community school, which would have been consistent with the recommendations in the Einstein Evaluation.  For example, the DOE's Committee on Special Education did not consider placing M.J. in a 12:1:1 in a community school with additional supports, such as periods of Special Education Teacher Support Services[2] with the addition of summer school, or summer services, at a different location.  M.J.'s 2013 IEP similarly reflects that the DOE's Committee on Special Education did not consider these options.

55)     The only other justification given by the DOE for the recommendation was that M.J. required intense support.  But nothing in the 2013 IEP suggested that M.J. needs the DOE's most restrictive environment in order to make educational progress.  In fact, the 2013 IEP indicates that M.J. does not need the DOE's highest level of support, stating that M.J. is "able to focus her attention in class," and that "[s]he does not require prompting to remain on task."

56)     The DOE's District 75 schools are its only public schools which operate for 12 months.  Having determined to place M.J. in its District 75 schools, the DOE's Committee on Special Education then had the option of recommending a classroom with a 12:1:1 ratio, a 8:1:1 ratio, or a 6:1:1 ratio.  But the DOE's Committee on Special Education did not discuss with the Mother the possibility of placing M.J. in one of the classrooms with a larger student-to-teacher ratio, which would have given M.J. a larger population of students to interact with.  At the end of

---

[2] SETSS is specially designed and/or supplemental instruction provided by a special education teacher that can help a student stay in the general education classroom.
http://schools.nyc.gov/Academics/SpecialEducation/programs/environment/setss.htm (last visited March 16, 2015).
SETSS may be provided for as few as three hours per week and as much as 50% of each school day. *Id.*

the 2013 IEP meeting, Ms. Fochetta merely told the Mother that the 2013 IEP team was keeping the same placement as was recommended by the M.J.'s prior IEP.

57)   Indeed, Ms. Fochetta's testimony at the Impartial Hearing suggested that the DOE's Committee on Special Education recommended the District 75 6:1:1 only because it had been recommended to M.J. in her prior IEP.  Ms. Fochetta admitted that she did not give much thought prior to the 2013 IEP meeting about M.J.'s classification and program and that the DOE's Committee on Special Education was merely updating M.J.'s prior IEP.  But M.J.'s prior IEP was inappropriate.  It had been created without a meeting and without input from the Mother.

58)   At the Impartial Hearing, the DOE did not present any evidence that at the time of the 2013 IEP meeting, M.J. required its most restrictive environment in order to make educational progress.

59)   To the contrary, at the Impartial Hearing the Mother presented evidence that M.J. did not require the DOE's most restrictive educational program and that such a program was inappropriate for M.J.  The Mother's witnesses had either evaluated or observed and worked with M.J. in her school.

60)   Dr. Miller testified at the Impartial Hearing.  Dr. Miller has his Doctorate in psychology and a Master's Degree in Psychology.  He was part of the team that evaluated M.J. at Einstein.  He had performed an educational evaluation on M.J.  Other professionals at Einstein performed a pediatric neurodevelopmental and a speech/language evaluation on M.J.  Once the evaluations were completed, Dr. Miller and the other professionals met to discuss their findings and make diagnoses and recommendations for M.J., which was memorialized in the Einstein Evaluation.

61)     Dr. Miller testified that as a result of his work, he is familiar with the different public and private school programs in New York City for children with disabilities.

62)     He testified that the team recommended that M.J. continue in the 12:1:1 in a community school because it was the most appropriate public school setting for her.  Dr. Miller testified that the team recommended that if M.J. did not make progress in the 12:1:1 in a community school, she should be placed in an appropriate non-public school.

63)     Dr. Miller testified that the team did not recommend a program in a District 75 school because M.J.'s needs were not significant enough to warrant placement in that setting.  He also testified that a District 75 6:1:1 was too restrictive for M.J.  Dr. Miller explained:

> when we make recommendations for District 75 placement it normally occurs much earlier on in the schooling.  It's not to say that it can't for an older child but usually it's very early on with somebody who has a greater impairment with an autism spectrum disorder, a more severe intellectual disability, or emotional and behavioral disturbance that is unmanageable anywhere else.

64)     Dr. Tabone, the head of the Cooke Grammar School at the time of the Impartial Hearing, also testified.  Dr. Tabone has a Doctorate in psychology, a Master's Degree in Special Education, and a Master's Degree in Psychology.  Prior to working at Cooke, Dr. Tabone worked for the DOE, first as a classroom teacher for both special and general education for about 10 years, next as a special education coordinator and supervisor for the DOE for 5 years.  As a result, Dr. Tabone has knowledge about the DOE's public school programs, including the DOE's District 75 6:1:1 classes.

65)     Dr. Tabone testified similarly, that District 75 6:1:1 programs are for students who are not able to handle academic work or social interactions without significant assistance or prompting.  He testified that M.J. does not need nearly that much support to make academic progress.

**The DOE Deprived M.J. of a Free Appropriate Public Education**

15

**Because The Classification of Autism Was Inappropriate**

66)    M.J. did not meet the statutory criteria for a classification of Autism.  At the time of the 2013 IEP meeting, the DOE did not possess any evaluations that diagnosed M.J. with Autism.

67)    The Einstein Evaluation reported that M.J. "has few symptoms of Autism Spectrum Disorder."

68)    Under the New York Regulations, Autism is defined as:

a developmental disability significantly affecting verbal and nonverbal communication and social interaction, generally evident before age 3, that adversely affects a student's educational performance. Other characteristics often associated with autism are engagement in repetitive activities and stereotyped movements, resistance to environmental change or change in daily routines, and unusual responses to sensory experiences.

200.1(zz)(1).

69)    Ms. Fochetta conceded at the Impartial Hearing that M.J. does not engage in repetitive activities and stereotyped movements.

70)    To the contrary, at the 2013 IEP meeting, M.J.'s then-teacher reported to the DOE's Committee on Special Education that M.J. was able to focus her attention in class, and that M.J. always came to class prepared with her homework ready and waited for directions.

71)    At the Impartial Hearing, the DOE did not present evidence that M.J. is resistant to environmental change or change in daily routine.  In fact, the 2013 IEP reflected that M.J. was able to follow the routines of transitions.

72)    Further, the DOE's Committee on Special Education did not possess any evidence at the 2013 IEP meeting that showed unusual responses to sensory experiences.

73)    The DOE's Committee on Special Education did not possess any evidence at the 2013 IEP meeting that M.J.'s social interactions were significantly impaired.  At the 2013 IEP

meeting, the Mother told DOE's Committee on Special Education that M.J. has friends and M.J.'s then-teacher reported that M.J. was a role model to other students, was very well behaved, and that she was well liked.

74)     The evidence at the Impartial Hearing was that M.J.'s greatest impediment is her phonological disorder and her speech and language delays.

75)     At the Impartial Hearing, Ms. Fochetta testified that, prior the 2013 IEP meeting, she did not give any significant thought to M.J.'s classification and merely classified her with Autism because she had previously been classified with Autism in 2012.  This failure to consider other classifications, especially in light of the information that the DOE's Committee on Special Education possessed, was a procedural violation of the IDEA.

76)     M.J.'s inappropriate classification of Autism resulted in the deprivation of a free appropriate public education because it rendered it more likely than not that M.J. would be placed a class with students classified with autism, which was inappropriate for M.J.

77)     At the Impartial Hearing, Ms. Fochetta admitted, as she has in other cases, that the majority of students in District 75 6:1:1's are classified with autism.  (*See F.O. and E.O v. N.Y.C. Dep't of Educ.*, No. 11 Civ. 6660 (DAB), ---F.Supp.2d---, 2013 WL 5495493 (S.D.N.Y. Oct. 2, 2013); *G.R. o/b/o B.S. v. N.Y.C. Dep't of Educ.*, No. 12 Civ. 441, 2012 WL 310947, at *2 (S.D.N.Y. Jan. 31, 2012).

**The DOE Fails to Timely Provide the Mother with a School Placement**

78)     The DOE did not offer M.J. a school placement at the time of the IEP meeting.

79)     In May of 2013 (three months after the 2013 IEP meeting), in order to secure a spot for M.J. in the event that the DOE failed to offer her an appropriate public school placement, the Mother signed a contract with Cooke for M.J. to attend Cooke for the summer

17

term of the 2013-2014 school year, the tuition for which is $7,875.00, and for M.J. to attend
Cooke for the September 2013-June 2014 school term, the tuition for which is $52,500.00.

80)    By the middle of June, the DOE had still failed to provide the Mother with a final
notice of recommendation ("FNR") of a public school placement for M.J. The 12-month school
year commenced on July 1, 2013. Thus, in a letter dated June 17, 2013, the Mother timely
provided the DOE with 10 days' notice that she was unilaterally placing M.J. in Cooke because
the IEP was inappropriate and because the DOE had not offered M.J. a placement for the 12-
month 2013-2014 school year.

**The DOE Recommends an Inappropriate Placement**

81)    The Mother finally received an FNR from the DOE on July 8, 2013, one week
after the commencement of the 12-month school year. Despite this fact, the Mother immediately
tried to schedule an appointment to visit with the recommended placement, Cornerstone
Academy for Social Action ("CASA") in the Bronx, but the telephone number on the FNR was
incorrect. The Mother eventually spoke to someone at CASA after conducting her own
substantial efforts and research to locate the correct phone number.

82)    The Mother visited CASA at the end of July, 2013.

83)    CASA was inappropriate for M.J. because the classrooms with 6:1:1 staffing
ratios taught students with autism who were much lower functioning than M.J. The students
were generally non-communicative and had a variety of maladaptive behaviors, such as self
stimulation, hand flapping, students with helmets, assistive communication devices.

84)    CASA employees showed Dr. Tabone and the Mother toured the classroom in
which M.J. would be placed. The students were all boys and one girl. They were low-
functioning students who did not have the ability to communicate, requiring communications
boards, assistive communication devices, and pictures.

85)   Placing M.J. in that classroom in that school was inappropriate because she is higher-functioning than the students in that classroom, and because she does not have the significant learning, social/emotional and adaptive issues of the students in that classroom.

86)   Further, M.J.'s 2013 IEP mandates that she receive counseling services, and CASA only had one part-time counselor once or twice a week who it shared with other buildings. Thus, M.J. would not have received the counseling mandated on her 2013 IEP.

87)   After visiting CASA, the Mother determined that it was an inappropriate school for her daughter. She promptly notified the DOE, in a letter dated August 1, 2013, that she rejected the proposed placement, provided reasons why, and asked the DOE to offer an appropriate placement for M.J. The DOE never addressed the Mother's concerns and never offered the Mother an appropriate placement for M.J.

**The Cooke School Is Appropriate to Meet M.J.'s Needs**

88)   Cooke is an appropriate placement for M.J. M.J. has attended Cooke since the summer of 2012. Cooke is a school for students with cognitive impairments, communication disorders, and learning disabilities. The Cooke Center Grammar School is comprised of the Grammar School (for kindergarten through fifth grade) and a Middle School, comprised of the sixth through eighth grades (the "Middle School"). Head teachers at the Middle School have Master's Degrees in special education, and assistant teachers have a Bachelor's Degree in a related field.

89)   The students all receive instruction in English language arts, social studies, math, science, life skills, and social skills. The Middle School has related services for the students, including counseling, speech and language therapy, occupational therapy, and physical therapy, built into the students' schedules.

90)     The Middle School groups students into five separate groups, referred to as "cohorts," based upon the students' communication skills, social/emotional functioning, and general adaptive skills level.  The students generally stay in their groups for instruction, but move classrooms for different subjects and are mixed with different students for gym and/or related services.

91)     For the 2013-2014 school year, M.J. was placed in the second-highest/most independent cohort in the Middle School.  There were 11 students in M.J.'s class, as well as two teachers.  The students in M.J.'s class had a range of disabilities, including learning disabilities, language-based disabilities, intellectual disabilities, and autism.  The teachers engaged in a high degree of small group and independent work in addition to whole class discussion.

92)     This setting was appropriate for M.J. because she was able to participate in the whole class and socially with her peers.

93)     Dr. Tabone explained that M.J. benefited socially by being grouped in a classroom comprised of students like her, with either speech and language issues, learning issues, and/or developmental issues.  The students all have similar language and social skills.  Dr. Tabone testified that he participated in placing M.J. in her cohort, and that she was placed in her group because the group has a higher level of independence and can handle abstract work.

94)     Cooke addressed M.J.'s significant speech and language processing needs and her academic deficits that result from her language processing issues.  Cooke has a large staff that addresses speech and language processing, as well as speech and language personnel who work closely with the Middle School teachers to make modifications to the curriculum without compromising the sophistication of the topics and breadth of instruction.

**The Mother Cooperated Fully with Defendants**

20

95)     The Mother cooperated fully with the school district throughout the process.  The Mother participated in the 2013 IEP meeting.   She objected to portions of the DOE's recommendations both at the 2013 IEP meeting and in writing to the DOE.  The Mother timely provided the DOE with 10 days' notice, in a letter dated June 17, 2013, that she was unilaterally placing M.J. in Cooke because the 2013 IEP was inappropriate and because the DOE had not offered M.J. a placement for the 12-month 2013-2014 school year.

96)     When she finally did receive the FNR—past the commencement of the 2013-2104 school year—the Mother immediately tried to schedule an appointment to visit CASA (the recommended placement), but the telephone number on the FNR was not the correct telephone number for the school.  The Mother was given several different telephone number, but worked diligently to contact CASA to schedule a visit.

97)     After she visited CASA and determined that it was an inappropriate school for her daughter, she promptly notified the DOE, in a letter dated August 1, 2013, that she rejected the proposed placement, provided reasons why, and asked the DOE to offer an appropriate placement for M.J.  The DOE never addressed the Mother's concerns about CASA and never offered M.J. an appropriate placement.  Accordingly, the equities favor granting the Mother direct tuition payment.

**An Impartial Hearing Officer Correctly Ruled in Favor of the Mother**

98)     The Mother filed a Due Process Complaint on August 20, 2013.

99)     An Impartial Hearing was held on October 30, November 1, and December 2, 2013. In the Findings of Facts and Decision dated January 8, 2014, the IHO found that the DOE had failed to offer M.J. a free appropriate public education because the District 75 6:1:1 program was unduly restrictive and ordered the DOE to pay for M.J.'s tuition at Cooke for the 2013-2014 school year. (Ex. A, at 10.)

100)   As to the Mother's other arguments, the Hearing Officer found that: (a) the DOE failed to provide the Mother with a timely FNR for M.J. but ruled that the failure to do so did not rise to the level of a deprivation of free appropriate public education; (b) the DOE properly classified M.J. with Autism; and (c) the District 75 6:1:1 program could have been reasonably calculated to afford educational benefit to M.J. (*Id.*)

101)   The Hearing Officer did not address the Mother's assertion that CASA was inappropriate.

102)   The Hearing Officer correctly found that Cooke was appropriate to meet M.J.'s needs and that the equities favored granting the Mother tuition payment because "district acted in dubious faith while the parent acted in exemplary good faith." (*Id.*, at 12.)

**The SRO Erroneously Reversed the IHO Decision**

103)   The DOE appealed the IHO Decision to the SRO from the portions of the IHO Decision that found that: (a) the DOE did not offer a free appropriate public education in the least restrictive environment; (b) the Mother was not timely provided with a FNR; (c) Cooke was appropriate; and (d) the equities favored ordering tuition payment.

104)   The Mother cross-appealed from the parts of the IHO Decision that found that: (a) the DOE's failure to timely provide the Mother with notice of a public school placement did not constitute a deprivation of free appropriate public education; (b) the DOE properly classified M.J. with Autism; and (c) the 6:1:1 program was reasonably calculated to afford M.J. an educational benefit.

105)   In a decision dated December 12, 2014, eight months after the SRO was supposed to issue a decision, (the "SRO Decision"), the SRO found that the DOE had offered M.J. a free appropriate public education, reversed the portions of the IHO Decision that found that the DOE

had not offered M.J. and free appropriate public education and that ordered the DOE to pay for

M.J.'s tuition at Cooke for the 2013-2014 school year.  (Exh. B, at 12.)

106)   More specifically, the SRO found that "least restrictive environment"

determinations are made by the extent to which a student can be educated with non-disabled

peers and whether the student has been mainstreamed to the maximum extent possible.  (*Id.*, at

6.)  The SRO concluded that once the DOE's Committee on Special Education decided to place

M.J. at a District 75 school, it was not obligated to consider placing M.J. in either a 12:1:1 or a

8:1:1.  (*Id.*)  This decision was erroneous because there was no evidence at the Impartial Hearing

that M.J. needed to be placed in a District 75 school in order to make educational progress.

Further, there was evidence from educational experts who knew M.J. that such a placement was

not appropriate, evidence that the SRO failed to address.  Thus, M.J.'s placement in the District

75 6:1:1, the DOE's "most restrictive" environment, was not appropriate.

107)   The SRO erroneously found that the Hearing Officer had correctly ruled that the

District 75 6:1:1 was appropriate for M.J. and that the DOE's Committee on Special Education

did not err in classifying M.J. with Autism.  (*Id.*, at 5-6.)

108)   As to the Mother's claim that the DOE failed to offer M.J. a public school

placement prior to the 2013-2014 school year, the SRO erroneously held that the Mother did not

offer evidence as to when the 2013-2014 school year started.  (*Id.*, at 12.)  The SRO wrongly

concluded that even if the DOE failed to timely offer the Mother a public school placement, this

did not constitute a procedural violation of a free appropriate public education, there was no

evidence that it deprived M.J. of educational benefits.  (*Id.*)  To the contrary, there was evidence

at the Impartial Hearing that the school year started on July 1, 2013.  Further, the DOE's failure

to offer M.J. a public school placement prior to the commencement of the school year deprived

M.J. of an educational benefit because, put simply, when M.J. was supposed to start public

school, she had no school to go to.  Not having a public school to attend and not receiving instruction is a deprivation of a free appropriate public education.

109)   As to the Mother's contention that CASA was inappropriate, the SRO found that because M.J. did not attend CASA, any assertion that it was not appropriate was speculative. (*Id.*)  The SRO erred because the Mother was not speculating as to whether CASA was inappropriate.  She visited the school and learned facts from the school that informed her that it was not appropriate.  She relied upon the information told to her by the school.  Both the Mother and Dr. Tabone testified about the school visit at the Impartial Hearing.

110)   Having made that decision, the SRO concluded that it need not consider whether Cooke was appropriate or whether the equities favored awarding the Mother direct tuition payment to Cooke for M.J.'s tuition for the 2013-2014 school year.  (*Id.*)

## CAUSES OF ACTION

### Count I:  Failure to Offer a Free Appropriate Public Education

111)   The Mother incorporates by reference each and every allegation contained in the foregoing paragraphs as if specifically alleged herein.

112)   Defendants' failure to offer M.J. an appropriate educational program or placement deprived him of his right to a free appropriate public education under IDEA, 20 U.S.C. § 1400, et seq., and the regulations promulgated thereunder.

113)   The Hearing Officer correctly held that Defendants failed to offer M.J. a program in its least restrictive environment.

114)   The Hearing Officer correctly held that Cooke was appropriate to meet M.J.'s needs and that the equities favored granting the Mother the relief she sought.

115)   The DOE also denied M.J. a FAPE because: (a) the DOE's failure to timely provide the Mother with notice of a public school placement constituted a deprivation of free

24

appropriate public education; (b) the DOE wrongly classified M.J. with Autism, resulting in an inappropriate IEP program recommendation; and (c) the District 75 6:1:1 program was not reasonably calculated to afford M.J. an educational benefit.

116)   The SRO erred in reversing the Hearing Officer and in finding that Defendants offered M.J. a free appropriate public education.   The SRO also erred in finding that: (a) the DOE's failure to timely provide the Mother with notice of a public school placement did not constitute a deprivation of free appropriate public education; (b) the DOE properly classified M.J. with Autism; and (c) the District 75 6:1:1 program was reasonably calculated to afford M.J. an educational benefit.

117)   Defendants have violated the rights of the Plaintiffs under 20 U.S.C. §§ 1400, et seq. by denying free appropriate public education to M.J.

### Count II:  Violation of Section 504 of the Rehabilitation Act

118)   The Mother incorporates by reference each and every allegation contained in the foregoing paragraphs as if specifically alleged herein.

119)   Section 504 provides, in pertinent part, that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance."   29 U.S.C. § 794(a). Section 504 requires the DOE to provide a free appropriate public education to students with disabilities.

120)   M.J. is a qualified individual with a disability under Section 504.

121)   By failing to provide M.J. with an appropriate program and placement for the 2013-2014 school year, ignoring evaluations, and recommending the most restrictive public

school placement, Defendants recklessly disregarded M.J.'s needs as a result of his disability and violated Section 504.

### Count III: <u>Violation of the New York State Education Law</u>

122)   The Mother incorporates by reference each and every allegation contained in the foregoing paragraphs as if specifically alleged herein.

123)   Section 4402 of the New York State Education Law requires school districts to "furnish suitable educational opportunities for children with handicapping conditions by one of the special services" listed in NYSEL § 4401(2).

124)   By failing to provide her with a free and appropriate public education, Defendants have violated the rights of M.J. and his Mother under New York State Education Law §§4401, 4404 and 4410 and Part 200 of the Regulations of the New York State Commissioner of Education, 8 N.Y.C.R.R. § 200.

### <u>RELIEF</u>

WHEREFORE, the Mother respectfully requests the following relief: Issue a Judgment that:

a) Defendants failed to provide a free appropriate public education, in violation the Plaintiffs' rights under the IDEA and New York Education Law;

b) Defendants unlawfully discriminated against M.J. under Section 504, by excluding her from her right to receive free appropriate public education for the 2013-2014 school year and failing to accommodate her disability;

c) Cooke was an appropriate unilateral placement for M.J. by the Mother under the IDEA and New York Education Law;

d) the equitable considerations favor ordering the DOE to pay the cost of the Cooke for M.J. to attend during the 2013-2014 school year;

e) ordering the DOE to pay the cost of the Cooke for M.J. to attend during the

2013-2014 school year, which totaled $60,375.00;

f) awarding Plaintiffs their costs and attorney's fees; and

g) Granting such other and further relief as may be appropriate.

Dated: April 6, 2015
      New York, New York

Respectfully submitted,

Caroline J. Heller (CH-8814)
*Greenberg Traurig, LLP*
The MetLife Building
200 Park Ave.
New York, New York
(212) 801-9200
hellerc@gtlaw.com
*Attorneys for Plaintiffs*